[Cite as *FCX Performance, Inc. v. Aurorium, L.L.C.*, 2026-Ohio-2608.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

FCX PERFORMANCE INC., D/B/A
PIERCE PUMP COMPANY, ET AL.,

        Plaintiffs-Appellees,

        v.

AURORIUM, LLC,

        Defendant-Appellant.

:
:
:
:
:
:
:

No. 115420

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 9, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-25-111629

### *Appearances:*

Lewis Brisbois Bisgaard & Smith, LLP, Ryan K. Rubin, Daniel A. Leister, and Scott J. Pullar, *for appellees.*

FBT Gibbons LLP, Ryan W. Goellner, and Darren A. Craig, pro hac vice, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant Aurorium, LLC ("Aurorium") appeals the trial court's judgment entry granting summary judgment in favor of plaintiffs-appellees, FCX Performance, Inc. d/b/a Pierce Pump Company and EADS Distribution, LLC

("FCX") on both FCX's complaint and Aurorium's counterclaim. Finding no merit to the appeal, this court affirms.

## I. Procedural History

{¶ 2} On February 7, 2025, FCX brought suit against Aurorium, asserting claims for breach of contract, action on account, and unjust enrichment. The complaint alleged that Aurorium breached a broad Supply Agreement ("Supply Agreement") that incorporated FCX's Terms and Conditions ("FCX T&Cs") by failing to pay FCX for goods and services totaling $290,850.10. FCX attached the relevant invoices to its complaint demonstrating the amount owed, all of which originated from FCX and/or its affiliated entities depending on the products or services purchased. The Supply Agreement was not attached to the complaint.

{¶ 3} Aurorium responded with an answer and counterclaim. In its answer, it admitted to certain allegations contained in Paragraphs 6, 7, 8, and 9 of FCX's complaint. Those complaint paragraphs provided:

> 6. Plaintiffs and Defendant are Parties to a Supply Agreement, and under the terms of the same, Plaintiffs are expressly identified as a Seller and Defendant is expressly identified as a member of a Buyers Group defined as a consortium of entities joined together to consolidate and centrally source purchases of products and services.
>
> 7. Following entering into the Supply Agreement, in relation to this matter, Defendant began ordering products from Plaintiffs to be delivered to a location at 30140 Eden Church Road, Denham Springs, Louisiana 70726.
>
> 8. The purchase orders and invoices are reflected by the following documents which are incorporated herein by reference:
>
>> a. Defendant's Order Number 3644696 with Invoice Number 5039552 is attached hereto as Exhibit "A[,]"

b. Defendant's Order Number 3633273 with Invoice Number 5046317 is attached hereto as Exhibit "B[,]"

c. Defendant's Order Number 3633273 with Invoice Number 5065064 is attached hereto as Exhibit "C[,]"

d. Defendant's Order Number 3832791 with Invoice Number 5101757 is attached hereto as Exhibit "D[,]"

e. Defendant's Order Number 5163743 is attached hereto as Exhibit "E[.]"

9. Plaintiff FCX was additionally retained via Change Order Request to install nitrogen headers to each seal pot location. The total cost was $44,200.00. A copy of the Change Order Request is attached hereto as Exhibit "F."

{¶ 4} Although FCX did not append a copy of the Supply Agreement to the complaint, Aurorium nonetheless admitted that it was a party to the Supply Agreement and admitted that the terms of the Supply Agreement required payment within "60 days" of the invoice date.[1] Aurorium argued that FCX was in breach of the agreement because it provided defective products, and thus argued that under the Supply Agreement, they were entitled to withhold payment until receipt of conforming products.

{¶ 5} Aurorium counterclaimed against FCX for breach of contract and breach of the implied covenant of good faith and fair dealing alleging "at least $263,556.90" in damages stemming from delays caused by the defective or untimely

---

[1] Although FCX alleges in its complaint, and Aurorium admits in its answer, that payment was due within 60 days of the invoice, the Supply Agreement provided that "unless otherwise agreed by seller in writing, full cash payment is due within thirty [30] days after the invoice date." The invoices attached to the complaint allowed for 60 days for payment.

products. Aurorium's counterclaim referenced the Supply Agreement as containing an "express and/or implied warranty." Aurorium contended that it was damaged because FCX (1) did not ensure that the products were timely delivered and (2) furnished defective products. Aurorium claimed it brought these issues to FCX's attention and FCX either offered to provide a credit for the costs associated with the defective products or provide new parts to cure the defective products. Aurorium alleged that FCX's failure to deliver functioning products in a timely matter delayed use of a manufacturing plant and caused Aurorium to incur costs associated with the removal, correction, and reinstallation of the defective products. Attached as Exhibit A to its counterclaim was a demand letter sent by Aurorium to FCX on June 24, 2024, explaining and seeking redress for these alleged damages. Despite conceding that it was a party to the Supply Agreement that contained a warranty, Aurorium also did not attach a copy of the Supply Agreement to its counterclaim and did not object to FCX's failure to attach a copy of the agreement to its complaint until after FCX filed its motion for summary judgment.

{¶ 6} FCX's answer to Aurorium's counterclaim again admitted to the existence of the Supply Agreement and admitted that "the Supply Agreement contains a 'Limited Warranty and Warranty Disclaimer' within and pursuant to [FCX T&Cs]." Despite both parties acknowledging their obligations under the Supply Agreement, neither party provided a copy of the Supply Agreement to its respective pleadings.

{¶ 7}    In May 2025, FCX moved for summary judgment on its complaint and on Aurorium's counterclaims. The motions for summary judgment argued that Aurorium admitted that it was bound by the Supply Agreement that incorporated FCX T&Cs. FCX provided that the following provisions within the Supply Agreement governed the dispute:

> 10. LIMITED WARRANTY AND WARRANTY DISCLAIMER - The Goods sold hereunder and/or used in connection with the services are not manufactured by us, and as such, we make no warranty, express or implied, concerning such Goods other than that we have good title to such Goods and will use our reasonable commercial efforts to obtain from each manufacturer, in accordance with the manufacturer's warranty, the repair or replacement of Goods that may prove to be defective in material or workmanship. Services provided by third party contractors are subject only to such warranties as are extended by such third party contractors. Notwithstanding the foregoing, to the extent we are permitted and able and so long as Buyer has paid in full for the Goods or services subject to the warranty claim, we will pass on and make available to you any warranties made by the suppliers, manufacturers of such Goods or third party contractors. For services provided directly by Seller, we warrant that our service will be performed in accordance with applicable industry standards prevailing at the time of performance. Our obligations under this warranty are conditioned upon you notifying us of any alleged breach of the foregoing warranty promptly after discovery, and in any event not later than 90 days after substantial completion of our services, our satisfaction upon inspection that the warranty has been breached, and that Buyer has paid in full for the services subject to the warranty claim. In the event of a breach of this warranty we will correct the defective labor or workmanship at our expense or, at our discretion, give you credit in a reasonable amount on account of the defect, but in no event in an amount greater than the price paid of the services hereunder. Except as stated hereinabove, Seller makes no other warranties concerning the Goods whatsoever. SELLER DISCLAIMS AND EXCLUDES ALL OTHER EXPRESS WARRANTIES AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

11. LIMITATIONS OF REMEDIES AND DAMAGES -You agree that our obligation described in the preceding paragraph is your sole and exclusive remedy, and that our total liability to you, your customers or to any other person, relating to this contract, its performance or non-performance, or from the use of Goods furnished or services provided, is limited to the price of the Goods and/or services giving rise to the claim.  Except as to title, such obligation and liability shall terminate at the end of the manufacturer's warranty period for the applicable Goods.  SELLER AND ITS SUPPLIERS WILL NOT, IN ANY EVENT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PENAL DAMAGES INCURRED IN CONNECTION WITH THE GOODS; WHETHER ANY CLAIM FOR RECOVERY IS BASED UPON OR ARISES OUT OF THEORIES OF CONTRACT, NEGLIGENCE, TORT (INCLUDING STRICT LIABILITY) OR OTHERWISE, INCLUDING BUT NOT LIMITED TO BACK CHARGES, LABOR COSTS, COSTS OF REMOVAL, REPLACEMENT, TESTING OR INSTALLATION, LOSS OF USE OF THE GOODS OR ANY ASSOCIATED PRODUCTS, DAMAGES TO ASSOCIATED PRODUCTS, LATENESS OR DELAYS IN DELIVERY, UNAVAILABILITY OF GOODS, COST OF CAPITAL, COST OF SUBSTITUTE GOODS, FACILITIES OR SERVICE, DOWNTIME, OR CLAIMS FROM YOUR CUSTOMERS OR OTHER PARTIES TO YOU OR DIRECTLY TO US FOR SUCH DAMAGES.

{¶ 8}    In support of its motion for summary judgment on its complaint, FCX relied on an affidavit from Scott Esparza, FCX's Regional Vice President-South and records custodian.  His affidavit provided that "[a] true and accurate copy of the Supply Agreement containing [FCX T&Cs] is attached as Exhibit 1."  In a separate filing, FCX requested to file Exhibit 1 under seal, contending that it "includes confidential and proprietary financial and business information of one of the parties involved in this case."  The court granted this motion.

{¶ 9}    In response, Aurorium sought leave to amend its answer, arguing that it needed to clarify that it did not intend to concede that it had entered into the specific Supply Agreement that FCX now provided.  Aurorium did not offer a copy

of the version it allegedly agreed to and signed.  Aurorium also opposed FCX's motion for summary judgment, contending that there were genuine disputes regarding whether (1) the Supply Agreement was enforceable under the statute of frauds, (2) the warranty within FCX T&C's achieved its essential purpose, and (3) the Supply Agreement /FCX T&Cs or Aurorium T&Cs govern the transactions.

{¶ 10} Aurorium supported its opposition with and argued that its purchase orders submitted to FCX incorporated by reference, "The Vertellus General Terms and Conditions of Purchase" ("Aurorium T&Cs").[2]  Aurorium  maintained that Aurorium T&Cs were the relevant terms and conditions that FCX was bound by rather than FCX T&Cs that were incorporated into the Supply Agreement.  Under the Aurorium T&Cs,

> **Priority**. Any purchase of Goods and/or Services by Buyer from Seller is subject to the following terms and conditions: (1) any written agreement signed by both parties regarding the Goods and/or Services, (2) any Riders incorporated by reference or attached to the Purchase Order, (3) all terms and conditions listed below and on the purchase order or scheduling agreement, quantity contract or dollar contract (hereinafter referred to as the "Purchase Order"), including other documents incorporated by reference by Buyer on the Purchase Order, and (4) all specifications and drawings accepted or approved in writing by Buyer. Collectively and separately, the documents listed above shall be referred to as the "Agreement."  Notwithstanding the foregoing, any Seller's terms and conditions are hereby expressly excluded from the Agreement.  Buyer's documents or agreements comprising the Agreement are intended to be complementary. If there is a conflict or inconsistency between the Agreement documents, the order set forth above shall govern such conflict inconsistency.

---

[2] FCX also relied on an affidavit from Esparza in support of its motion for summary judgment on Aurorium's counterclaim, explaining that  Aurorium was formerly known as Vertellus, LLC.  Aurorium did not dispute this assertion.  For ease of understanding, we modify all references to "Vertellus" in the respective agreements to reflect "Aurorium."

. . .

**Delivery; Risk of Loss**.  TIME IS OF THE ESSENCE.  Seller acknowledges that Buyer has strict requirements as to scheduled delivery dates for Goods and performance dates for Services which are essential to Buyer's business.  Deliveries must be made in accordance with the requirements of the Purchase Order.  Buyer is not obligated to accept early deliveries, late deliveries, partial deliveries or excess deliveries.  Unless otherwise specified, all Goods shall be sold DDP Buyer's designated facility (INCOTERMS 2010) with shipment of the Goods to commence upon Buyer's approval.  Unless otherwise agreed to by Buyer and expressly stated on the Purchase Order, all expenses (including customs duty, taxes and other charges) and risk of loss for damage incurred in the transportation of the Goods, including loss during loading or unloading, shall be borne solely by Seller and shall not pass to Buyer until delivery of Goods and after Buyer has inspected and accepted the Goods.  If specified on the Purchase Order, the Goods shall be tendered in a single delivery.  At Buyer's request, Seller shall provide Buyer with a shipment schedule.

**Representations and Warranty**.  Seller represents and warrants that all Goods and Services, as the case may be, are: (a) owned by Seller or Seller has the right to transfer free and clear title to Buyer, (b) free from defects in materials, design and workmanship, (c) in good working order and condition (d) in strict conformance to the specifications, drawings or descriptions, or Samples, Instructions, performance capabilities and other standards Buyer provides to Seller, (e) do not infringe, violate or misappropriate any patent, copyright or other intellectual property rights; and, (f) the manufacture, production, installation, sale and use by Buyer are in compliance with any and all applicable laws, rules and regulations. Seller knows of Buyer's intended use and expressly warrants that all Goods and Services covered by the Agreement will be fit and sufficient for the purposes intended by Buyer.  Statements of Seller, or its agents in its advertising and its promotional material as to quality, grade, performance and use of the Goods and/or Services are Seller's express warranties.   All warranties survive any inspection, delivery or acceptance of the Goods and/or Services, or payment for the Goods and/or Services delivered and such warranty shall run to Buyer, Buyer's customers and/or Buyer's successors and assigns, and shall not be deemed exclusive of any other warranties, express or implied. In the event that Buyer is in any way enjoined from using the Goods or any portion thereof, Seller shall promptly, at its expense (including,

but not limited to, the payment of any royalties occasioned by the following) either: (a) provide to Buyer non-infringing means of using it; (b) negotiate and procure for Buyer the right to use it without restriction; or, (c) if neither (a) nor (b) can be accomplished within a reasonable time period, reimburse Buyer for all monies paid for it. Seller will comply with the Supplier Code of Conduct located at http://www.vertellus.com/supplier-code-ofconduct.

. . .

**Manufacturer's Warranties**. In addition to the warranties granted by Seller in the Agreement, if Seller is not the original manufacturer of Goods or source of Services, Seller shall pass through, assign, transfer and convey to Buyer all warranties related thereto provided by the manufacturer and/ or supplier, to the extent that Seller has the legal capacity to do so. If the manufacturer's or supplier's warranties are for a period greater than Seller's warranty to Buyer as otherwise provided in this Agreement, then Seller shall warrant the same to Buyer to the extent and for the duration of such manufacturer's or supplier's warranty.

{¶ 11} On July 7, 2025, the trial court denied Aurorium leave to amend its answer. Subsequently on July 12, 2025, the trial court granted summary judgment in favor of FCX on all claims, ordering Aurorium to pay $290,850.10 in damages. The trial court also granted summary judgment in favor of FCX on Aurorium's counterclaims and thus dismissed those claims.

{¶ 12} This appeal followed. The trial court denied Aurorium's request to stay the proceedings, including enforcement of the judgment, pending appeal.

## II. The Appeal

{¶ 13} Aurorium raises two assignments of error, which will be addressed out of order for ease of discussion.

## A. Leave to Amend Answer

{¶ 14} In its second assignment of error, Aurorium contends that the trial court abused its discretion in denying it leave to amend its answer and counterclaim because the proposed amendments to its pleadings were not made in bad faith, not unduly delayed, and not prejudicial to FCX. The basis for the amendment was to "clarify" that it did not intend to concede to the specific Supply Agreement subsequently provided by FCX in support of summary judgment.

{¶ 15} Civ.R. 15(A), which allows for amendment of pleadings by leave of court or by written consent of the other party after a responsive pleading has been made, expressly provides that "[l]eave of court shall be freely given when justice so requires." "A motion for leave to amend should be granted absent a finding of bad faith, undue delay, or undue prejudice to the opposing party." *Hoover v. Sumlin*, 12 Ohio St.3d 1, 6 (1984).

{¶ 16} The grant or denial of leave to amend a pleading is within the sound discretion of the trial court. *Supportive Solutions Training Academy, L.L.C. v. Electronic Classroom of Tomorrow*, 2013-Ohio-3910, ¶ 10 (8th Dist.). Accordingly, an appellate court applies an abuse-of-discretion standard of review to a trial court's decision to grant or deny a party leave to amend a pleading. *Wilmington Steel Prods. Inc. v. Cleveland Elec. Illum. Co.*, 60 Ohio St.3d 120, 122 (1991). A court commits an abuse of discretion by "exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 17} In this case, Aurorium sought leave to amend its answer after FCX moved for summary judgment in reliance on Aurorium's admission within its answer that it was a party to the Supply Agreement. Despite FCX's reliance on these admissions, Aurorium contended that FCX would not be prejudiced. We find that waiting to change its responsive pleading until the opposing party moved for summary judgment in reliance on the responsive pleading is prejudicial. *See Natl. City Bank v. Skipper*, 2009-Ohio-5940 (9th Dist.) (A party "should not be permitted to sit by for this period and bolster up their pleadings in answer to a motion for summary judgment.").

{¶ 18} Moreover, Aurorium did not provide any arguments suggesting that its motion was timely or indicate why the trial court should grant it leave to amend its answer 15 days prior to the scheduled trial date. Where a motion for leave to amend is not timely tendered and no reason is apparent to justify the delay, a trial court does not abuse its discretion in refusing to allow the amendment. *Meadors v. Zaring Co.*, 38 Ohio App.3d 97, 99 (1st Dist. 1987), citing *Peterson v. Teodosio*, 34 Ohio St.2d 161 (1973).

{¶ 19} Based on the foregoing, we find that the trial court did not abuse its discretion in denying Aurorium's motion for leave to amend its answer. Accordingly, Aurorium's second assignment of error is overruled.

## B. Summary Judgment

{¶ 20} Aurorium's first assignment of error contests the court's grant of summary judgment in favor of FCX on both the complaint and counterclaims. We

review the trial court's judgment de novo, using the same standard that the trial court applies under Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Accordingly, we stand in the shoes of the trial court and conduct an independent review of the record.

### 1. Standard of Review

{¶ 21} Under Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably to the party against whom the motion is made, reasonable minds can only reach a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶ 22} The moving party bears the initial burden of setting forth specific facts that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate. *Id.* at 293. If the moving party meets this burden, the nonmoving party has a reciprocal burden of setting forth specific facts using evidence permitted by Civ.R. 56(C) to show that there is a genuine issue for trial. *Id.* Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

### 2. FCX's Complaint

{¶ 23} "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41. Simply, to prevail on a breach-of-contract claim, a party must prove the existence of a contract, the party's performance under the contract, the opposing party's breach, and resulting damage. *Depompei v. Santabarbara*, 2015-Ohio-18, ¶ 20 (8th Dist.). We address each element in turn.

{¶ 24} First, FCX was required to establish the existence of a contract. This issue is critical, as there are two potential contracts governing this transaction – (1) the Supply Agreement that incorporates FCX T&Cs, and (2) Aurorium T&Cs that were incorporated into the purchase orders that were sent to FCX and ultimately fulfilled.

{¶ 25} Based on our disposition of Aurorium's second assignment of error, the record conclusively establishes by admission that Aurorium and FCX entered into the Supply Agreement that expressly incorporated FCX T&Cs. *See, e.g., Shearer v. Creekview Broadview Hts. Homeowners' Assn.*, 2010-Ohio-5786, ¶ 13 (8th Dist.) ("[A]n admission in a pleading dispenses with proof and is equivalent to proof of the fact."). Based on Aurorium's admission that it was a party to the written Supply Agreement, we need not address its R.C. 1302.04(A) statute-of-frauds defense and arguments.

{¶ 26} In response to FCX's summary judgment motions, Aurorium argued against the existence of the Supply Agreement, claiming the following:

> No signed contract relating to the sale is designated in the record. Though FCX argued that a "Supply Agreement" governed the parties['] terms, FCX never provided a signed, authenticated copy of the Supply Agreement for the record. . . . Instead, after the close of discovery and one day before the dispositive motion deadline, FCX produced a signed copy of the Supply Agreement to Aurorium. . . . But this signed document was not authenticated, and FCX failed to make it part of the summary judgment record.

{¶ 27} We find that the record was properly supplemented with the signed Supply Agreement proving that Aurorium was one of the members of the buyer's group that was bound by the Supply Agreement. The unsigned Supply Agreement was initially filed with Esparza's affidavit that confirmed its truth and accuracy. The trial court subsequently permitted FCX to substitute the unsigned agreement with Aurorium's signed agreement. The executed Supply Agreement demonstrates that Aurorium is a member of the buyer's group. Aurorium's arguments to the contrary do not dispute the contents of the Supply Agreement or the parties thereto, only that the agreement was not properly made part of the record. Aurorium's attempt to attack the procedural timeline and filing of the Supply Agreement is insufficient to support its reciprocal burden under Civ.R. 56(C) of demonstrating a genuine issue of material fact remains regarding the existence and validity of the Supply Agreement.

{¶ 28} We now must determine whether Aurorium T&Cs, incorporated by its purchase orders, have any force or control over the disputed transactions. We

begin by looking at the terms of the binding Supply Agreement.  It pertinently

provides:

> Goods and Services sold by [FCX] . . . are expressly subject to the terms and conditions set forth below.  Any different or additional terms of conditions in buyer's purchase order or similar communication are objected to and shall not be binding on [FCX] unless agreed to in writing. . . . [Aurorium's] acceptance of shipment or performance and/or payment for the goods or services constitutes acceptance of the seller's terms and conditions.

{¶ 29} Contract interpretation is well settled in Ohio courts.  The Ohio

Supreme Court has stated:

> We seek primarily to give effect to the intent of the parties, and we presume that the intent of the parties is reflected in the plain language of the contract.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.  As a result, if the language of a contract is plain and unambiguous, we enforce the terms as written, and we may not turn to evidence outside the four corners of the contract to alter its meaning.  *See id.*; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989) ("Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence").  When considering the language of a particular contractual provision, "[c]ommon words . . . will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." [*Cincinnati Ins. Co. v.*] *Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, at ¶ 34, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.

*Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 13; *see also*

*United States Acute Care Solutions, L.L.C. v. Drs. Co. Risk Retention Group Ins.*

*Co.*, 2025-Ohio-5010, ¶ 12.[3]

---

[3] R.C. 1302.05 treats the parol evidence rule more liberally than the common law rule in this quotation.  Nonetheless, that section does not apply herein because it only

{¶ 30} Additionally, courts "must apply clear and unambiguous contract provisions without regard to the relative advantages gained or hardships suffered by the parties." *John R. Jurgensen Co. v. Fairborn*, 2015-Ohio-5478, ¶ 14 (1st Dist.), citing *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 36. Further, it is not the court's responsibility to rewrite a contract to provide for a more equitable result. *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 362 (1997).

{¶ 31} Based on plain and unambiguous terms, both FCX and Aurorium agreed pursuant to the Supply Agreement that (1) the purchases were expressly subject to the terms and conditions in FCX T&Cs, (2) Aurorium's warranty terms within its purchase order were explicitly objected to and not binding unless agreed-upon in writing, and (3) both parties were thus bound by FCX T&Cs when Aurorium accepted the goods or services.

{¶ 32} Aurorium argued that the court should engage in a "battle of the forms" analysis under R.C. 1302.10 to determine whether the Supply Agreement or Aurorium T&Cs terms are controlling. Such analysis is not necessary here because Aurorium has conceded that it is a party to the Supply Agreement that explicitly rejects any additional terms within the buyer's purchase order. Nonetheless, even if we did engage in this analysis, the result is the same.

---

implicates agreements that are not determined to be a complete and exclusive statement of the agreement and is only relevant when extrinsic evidence is used to explain or supplement.

{¶ 33} Aurorium used its own purchase order forms that incorporated its own terms and conditions. Pursuant to R.C. 1302.10(A), FCX's fulfillment of such purchase orders would constitute acceptance. The question, however, becomes whether the additional terms in Aurorium T&Cs have become part of the parties' overall agreement. In these situations, R.C. 1302.10(B) provides clear guidance:

> (B) The additional terms are to be construed as proposals for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies:
>
>> (1) The offer expressly limits acceptance to the terms of the offer.
>>
>> (2) They materially alter it.
>>
>> (3) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

{¶ 34} Applying R.C. 1302.10(B), we find that Aurorium T&Cs were merely proposals to the Supply Agreement because it tracks the provisions of R.C. 1302.10(B). Regarding subsection (B)(2), Aurorium concedes on appeal that its terms and conditions materially alter the terms and conditions incorporated into the Supply Agreement, particularly in relation to warranty, damages, and delay. Regarding subsection (B)(3), the Supply Agreement, incorporating FCX T&Cs, specifically objected to additional terms in purchase orders. Thus, if R.C. 1302.10 were applicable, we would be required to find that the terms within Aurorium T&Cs were proposals for addition to the Supply Agreement and that FCX is not bound by them according to the plain text of the agreement.

{¶ 35} Finally, Aurorium has not demonstrated that FCX agreed to Aurorium's additional terms in writing or withdrew its objections to Aurorium T&Cs, as required in the Supply Agreement as two methods of adding additional terms. And Aurorium has not argued unconscionability or some other defense to the creation of the Supply Agreement. In contrast, Aurorium has admitted that it was a party to the Supply Agreement and has failed to provide any evidence to the contrary. We therefore find that FCX has established that the Supply Agreement is the final expression of the parties' agreement and that Aurorium T&Cs did not become part of the parties' agreement.

{¶ 36} We now turn to the second element of a breach-of-contract claim — "the failure without legal excuse of the other party to perform when performance is due." Under this prong, FCX was required to demonstrate that Aurorium was in breach of the Supply Agreement.

{¶ 37} FCX argued that the Supply Agreement provided that payment was due within 30 days of the invoice date and Aurorium admitted that it had not paid FCX for the goods and/or services relevant to the invoices provided. In interrogatory No. 12, Aurorium admitted to withholding payment, relying on its T&Cs that they claimed governed this dispute. Aurorium explained that payment was withheld for certain products "because they were defective or otherwise delayed in its delivery in violation of the parties' agreement." But under the Supply Agreement Aurorium was not permitted to withhold payment, let alone the entirety of the amounts due when only a fraction of the products were unacceptable.

{¶ 38} Aurorium defended its actions, arguing that it was not required to pay for the delayed and defective products even if the Supply Agreement was the controlling document. It argued that if the Supply Agreement governed the instant transactions, an issue of material fact remained regarding whether "the limited remedies provision therein fails of its essential purpose."

{¶ 39} In support, Aurorium directs us to R.C. 1302.93. Under subsection (A)(1), "The agreement may . . . limit or alter the measure of damages recoverable under [the agreements] sections, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." Subsection (A)(2) provides that the parties "[r]esort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." Aurorium relies on subsection (B), however, that provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had [under the U.C.C.]."

{¶ 40} Paragraph 10 of the Supply Agreement provides the "sole and exclusive remedy," which includes repair and replacement warranties. Repair and replacement remedies "give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise." *Chemtrol Adhesives v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 56 (1989). Further, limited remedies generally fail only where the seller is unable or unwilling to make repair or replacements within a reasonable

time. *Id.* Ohio law provides that the determination of whether a warranty has failed to fulfill its essential purpose is ordinarily a question of fact for the jury. *Id.*

{¶ 41} However, in this case, Aurorium admitted that FCX replaced all defective or nonconforming products. Within its counterclaim, Aurorium specifically admitted that "[FCX] offered to issue Aurorium with a credit for the costs associated with the defective devices" and "[FCX] furnished new parts to accommodate the defective pumps." These admissions apply to all of the items ordered under the invoices and all of the items that Aurorium contended were defective. With this admission, there remains no genuine issue of material fact and thus FCX's exclusive remedy did not fail of its essential purpose. Moreover, in interrogatory No. 12, Aurorium further admitted to withholding payment solely relying on Aurorium T&Cs that they contended govern this dispute. It explained that payment was withheld for certain products "because they were defective or otherwise delayed in their delivery in violation of the parties' agreement." As we have established, however, Aurorium T&Cs were not made part of the Supply Agreement. Accordingly, Aurorium's arguments do not persuade this court that the remedy within the Supply Agreement failed to fulfill its essential purpose.

{¶ 42} We therefore find that FCX demonstrated as a matter of law that Aurorium did not perform under the contract and Aurorium has not satisfied its reciprocal burden of presenting a recognized defense for nonperformance under the contract to render summary judgment in favor of FCX improper on this issue.

{¶ 43} The third and final element of FCX's breach-of-contract claim required FCX to prove its damages resulting from the breach. Aurorium did not dispute the invoice amounts, admitted in its answer to the authenticity of the invoices contained in the complaint, and further admitted that it did not pay any money owed on its account. This element is easily satisfied.

{¶ 44} Based on the foregoing, we find that the trial court did not err in granting summary judgment in favor of FCX on its complaint.[4]

### 3. Aurorium's Counterclaim

{¶ 45} Within this assignment of error, Aurorium also challenges the trial court's decision granting summary judgment in favor of FCX on Aurorium's counterclaim for breach of contract that was premised on receiving defective goods and breach of various warranties, including that FCX's limited warranty failed of its essential purpose. This issue has been addressed and rejected.

{¶ 46} Moreover, Aurorium's counterclaim sought only consequential damages, including delay in use, installation costs, travel expenses, maintenance, third-party construction costs, and engineering costs. These damages were not recoverable under Section 11 of FCX T&Cs. Under the Supply Agreement, total liability is limited to "the price of Goods and/or services giving rise to the claim," and damages relating to "special, incidental, consequential, or penal damages" are

---

[4] "Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject." *Digitalight Sys. v. Cleveland Clinic Found.*, 2022-Ohio-1400, ¶ 65 (8th Dist.). Having found summary judgment proper on FCX's breach-of-contract claim, it cannot recover under its unjust-enrichment claim.

specifically excluded, including "labor costs, costs of removal, replacement, testing or installation, loss of use of the goods or any associated products, damages to associated products, lateness or delays in delivery, unavailability of goods, cost of capital, cost of substitute goods, facilities or service, downtime, or claims from your customers . . . ." By its own terms, the Supply Agreement did not allow Aurorium to recover consequential damages such as those caused by delay or defects since it explicitly and conspicuously disclaimed all warranties. *See also* R.C. 1302.93(C) (limiting and excluding consequential damages unless the limitations or exclusions are unconscionable).

{¶ 47} Finally, Aurorium contends that FCX withheld credits that it offered for defective products and that it had withheld an order. The plain language of Sections 6 and 10 of FCX T&Cs, as incorporated into the Supply Agreement, allowed for the withholding of credits and future orders if Aurorium was in breach of the Supply Agreement. Once Aurorium's account became delinquent because it had not paid any amounts owed, FCX was not contractually obligated to provide Aurorium any further goods or services, or fill any of Aurorium's pending or future orders.

{¶ 48} Even construing all the evidence favorable to Aurorium, the nonmoving party, we find that FCX satisfied its burden that no genuine issue of material fact remained on Aurorium's counterclaim and that it was entitled to judgment as a matter of law. Accordingly, the trial court did not err in also granting summary judgment in favor of FCX on Aurorium's counterclaim.

{¶ 49} Aurorium's first assignment of error is overruled.

**{¶ 50}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR